GAYANE KHECHOOMIAN (SBN 296673)
201 N. Brand Blvd., Suite 200
Glendale, California 92203-3590
Telephone: (818) 454-0446
Email: gayane.khechoomian@gmail.com

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| BARKEV GHAZARIAN and GARO B. GHAZARIAN,<br><br>      Plaintiffs,<br><br>v.<br><br>REPUBLIC OF TURKEY,<br><br>      Defendant | Case No.:   2:19-cv-4664<br><br>**COMPLAINT FOR:**<br><br>**1. STATUTORY ELDER ABUSE**<br>**2. INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS**<br>**3. VIOLATION OF INTERNATIONAL LAW**<br>**4. BREACH OF FIDUCIARY DUTY**<br>**5. INTENTIONAL INTERFERENCE WITH EXPECTATION OF INHERITANCE** |

COMPLAINT   - 1

## COMPLAINT

Plaintiffs, BARKEV GHAZARIAN and GARO B. GHAZARIAN, bring this action and file this COMPLAINT against Defendant REPUBLIC OF TURKEY and, in support thereof, complain and allege as follows:

### NATURE OF THE CASE

1.     This case arises from tortuous acts to demean, degrade and ridicule an elderly man now 88 years of age.  In late 2017, Defendant's agents undertook a series of acts in furtherance of a targeted policy of Defendant designed to divest native Armenian Christians from Turkey of their identity and dignity and to sever them from their customs and religious practices on their native lands.  In applying this targeted policy to Plaintiff Barkev Ghazarian, and doing so in the United States, Defendant's agents unlawfully abused him by thwarting and harassing him in a manner to make him feel inferior and meaningless as a native Armenian Christian and to prevent him from passing knowledge of valuable cultural and religious native traditions and ancestral pilgrimage sites to his son, Plaintiff Garo B. Ghazarian, and progeny.  Defendant's agents' actions caused Plaintiff Barkev Ghazarian extreme mental anguish, indignity and suffering.  Defendant's agents' conduct also deprived his son, Plaintiff Garo B. Ghazarian, of valuable knowledge of the native traditions known and practiced by his father, his grandfather and his direct ancestors for generations at specific ancestral pilgrimage sites in their native

lands.   Plaintiff Barkev Ghazarian seeks redress against Defendant, under the doctrine of *respondeat superior,* for statutory elder abuse, intentional infliction of emotional distress, breach of fiduciary duty and violations of international law. Plaintiff Garo B. Ghazarian likewise seeks redress against Defendant for intentional interference with expectation of inheritance.

## PARTIES

2.   Plaintiff BARKEV GHAZARIAN ("Barkev") is a United States citizen born in Kaladouran, Turkey on April 20, 1931.   He is an Armenian Christian.  Barkev currently resides in Glendale, California.

3.   Plaintiff GARO B. GHAZARIAN ("Garo") is a United States citizen born in Beirut, Lebanon and is also an Armenian Christian.   Garo is the son of Barkev.  Garo also resides in Glendale, California.

4.   Defendant REPUBLIC OF TURKEY ("Defendant") is a foreign state with its capital in Ankara, Turkey.   Defendant has actual presence in the United States at 2525 Massachusetts Avenue NW, Washington D.C. 20008.

## JURISDICTION AND VENUE

5.   The Court has subject matter jurisdiction under the Foreign Sovereign Immunities Act ("FSIA"), specifically, 28 U.S.C. §§ 1605(a)(2) and (5).

6.   At all times relevant to this lawsuit, Defendant has been a foreign state as defined under the FSIA.

7.     Insofar as Defendant is a "foreign state" within the meaning of 28 U.S.C. § 1603, the claims pursued herein seek money damages from Defendant for personal injury occurring in the United States and caused by the tortuous acts or omissions of certain officials or employees of Defendant, committed within the United States while acting within the scope of their office or employment and resulting in serious personal injury in the United States.  Plaintiffs' claims are not based on the discretionary acts of Defendant's agents and do not involve malicious prosecution, abuse of process, libel, slander, misrepresentation, deceit or interference with contractual rights.

8.     Furthermore, and again insofar as Defendant is a "foreign state" within the meaning of 28 U.S.C. § 1603, the claims pursued herein are based upon a commercial activity carried on in the United States by Defendant; acts performed in the United States in connection with a commercial activity of Defendant elsewhere; and/or upon acts outside the territory of the United States in connection with a commercial activity of Defendant elsewhere that caused a direct effect in the United States.  These commercial activities carried on by Defendant involve substantial contact with the United States, including acts performed in the United States specifically, and have caused substantial damage to Plaintiffs in the United States.

9.     Pursuant to the FSIA, if the Court has subject matter jurisdiction, it also has personal jurisdiction over the defendant foreign state.

10.     The Court has original jurisdiction under 28 U.S.C. § 1330.

11.     Venue is proper in this federal district court under 28 U.S.C. § 1391(f)(1).

## STATEMENT OF FACTS

12.     Plaintiff Barkev Ghazarian was born in Kaladouran, Turkey on April 20, 1931.  He was born to Guiragos (sometimes spelled "Giragos") and Anna Ghazarian, both also Armenian Christians born in Kaladouran, in 1905 and 1913, respectively.

13.     Barkev's grandfather, Aristakes Ghazarian, was born in Kaladouran too in 1874.  Aristakes was one of five brothers born in Kaladouran, one of whom (Hagop) served as an officer in the Ottoman Turkish army.  Barkev's parents, his grandparents and their forefathers were all native Kaladouran Armenians.

14.     Barkev has two sons, Garo and Jacques Ghazarian.  The Ghazarian family's ancestral ties to Kaladouran date back several generations—well prior to, and through, the date the Republic of Turkey was founded.

*The Village of Kaladouran*

15.     In the 1930s, Kaladouran was a small village of Armenian inhabitants. Kaladouran and the neighboring Armenian villages surrounded the larger

1  Armenian town of Kessab.  Kaladouran was the most populated of the Kessab

2  villages.

3  16.     The town of Kessab is shown in regional, geographic context in the

4  figure below and is identified by the black pin:



5

6  17.     Kaladouran itself was comprised of several "neighborhoods," each

7  one named after the Armenian family clan which occupied that neighborhood.  One

8  of those neighborhoods, *Ghezellek,* was named after the Ghazarians.

9  18.     The Ghazarian family had farmlands and harvesting fields in

10 Kaladouran.  They grew wheat and tobacco on their farms and owned herds of

11 livestock.

12 19.     Barkev and his family attended one of the Armenian churches in

13 Kaladouran named *Sourp Asdvadzadzin* ("Holy Mother of God").

20.    Barkev attended the Mesrobian Armenian National School in Kaladouran until the third grade, the same school where his father was a schoolteacher.

21.    The photograph below, *circa* 1933-34, shows Barkev's father seated in the middle row, the fourth teacher from the left:



*Teachers: Nshan Seferian, Dikran Manjikian, Joseph Titizian, Giragos Ghazarian*

22.    Barkev, his parents, his grandparents and their forefathers lived as native Kaladouran Armenians, buried their ancestors in Kaladouran, tilled the fields of Kaladouran, grazed livestock in the pastures of Kaladouran and practiced their Armenian Christian faith in Kaladouran consistent with the specific customs and traditions they had developed over many generations.

23.     Barkev's family referred to Kaladouran as *mer yergiruh* in Armenian, which means "our country" in English.

24.     Even today, Barkev refers to Kaladouran as *yergirus* in Armenian, meaning "my country" in English.

*Baptism and Pilgrimage to the Holy Grounds of Ballum*

25.     As an Armenian Christian born in Kaladouran, Barkev was baptized at a sacred ceremonial site in Ballum, Turkey ("Ballum") in 1931, under the auspices of the Armenian Apostolic Church.

26.     Of course, baptism is one of the most important sacraments of the Christian faith; for Armenian Christians, it has been so for more than 1700 years.[1]

27.     Ballum (sometimes referred to as "Barlum") is the name given by Kaladouran Armenians to a site of ancient Greco-Roman ruins on the slopes of Mount Cassius, located a short distance east/northeast of Kaladouran.

28.     For centuries, it was the communal pilgrimage site for the native Armenian Christians of Kaladouran on the Feast of Assumption of the Holy Mother of God as well as for other important religious holidays, weddings, baptisms and ceremonies involving the coming of age of children.

---

[1] Armenians accepted Christianity as a state religion in 301 A.D., a century before Emperor Constantine converted the Roman Empire to Christianity.

29.    A portion of Ballum is depicted in the following photograph, also *circa* 1933-34:



30.    The rite of pilgrimage to Ballum was a revered religious and cultural tradition of Kaladouran Armenians.

31.    As a child, Barkev and his family would make the pilgrimage to Ballum together with other Kaladouran Armenian families and the village priests.

32.    The photograph below depicts one of the spaces in Ballum where Armenian families would make pilgrimage to practice their religious and cultural rites:

33.    Barkev remembers the path to Ballum and the fact that he and his family would sleep overnight at the pilgrimage site, under make-shift tents, during the ritual feasts.

34.    He remembers too the customs they would share at Ballum with other Armenian families from Kaladouran and the other villages of Kessab.

35.    Barkev last made the devotional pilgrimage to Ballum when he was approximately 8 years old.

36.    At that time, in the late 1930s, threats and violence against Christian Armenians in the villages of Kessab had intensified.

37.    It was a precarious time for Christian Armenians, particularly on the heels of Ottoman Turkish atrocities against, and deportation of, Armenians from their villages in 1909 and then again between 1914-1918.

38.   In 1939, Kaladouran was divided by a new border between Turkey and Syria.  The new demarcation line split the Armenian village of Kaladouran in two.

39.   Thereafter, Barkev's home and those of other Kaladouran Armenians remained on the Syrian side of the new border demarcation line, while Barkev's family's crop fields and meadowlands remained on the Turkish side.  The border was patrolled by armed Turkish border guards, and the Kaladouran Armenians were unable to cross to the Turkish side.

40.   Importantly, Ballum too was left on the Turkish side of the border demarcation line.

*The Decision to Make Religious Pilgrimage*

41.   Barkev is the last living Ghazarian in his family line with direct knowledge and first-hand experience of his native Kaladouran, of his family's native pilgrimage sites in Ballum and his family's native religious and cultural traditions as practiced there.

42.   Barkev is the last living Ghazarian in his family line who can identify the specific pilgrimage sites at Ballum from his own personal experiences.

43.   With this realization and the prospect of his increasing age, Barkev decided, in the fall of 2017, to return to his family's native and ancestral lands in

Turkey, to make pilgrimage to Ballum and to identify his family's places of worship for his sons, grandchildren and their progeny.

44.    Barkev wanted his children and grandchildren to know where to pray at Ballum should they one day return.

45.    He planned to take photographs of his family's prayer sites in Ballum so that his direct knowledge of his family's religious and cultural heritage in Ballum would not die with him.

46.    With the assistance of his son, Plaintiff Garo, Barkev visited Defendant's website, in early October 2017, to find an application for seeking entry to Turkey.

47.    The website instructed those seeking entry to Turkey to apply for a visa at least one month prior to the expected date of departure and provided a link to download the visa application form.

48.    With the assistance of his son Garo, Barkev completed the visa application form pursuant to its terms (the "Application").

49.    The visa application form, while containing a number of options for identifying the passport or status of the applicant, did not have any pre-written space or specific box to check in order to indicate that the applicant is a native Armenian Christian seeking entry for the purpose of a religious pilgrimage.

50.     However, the visa application form did have an option entitled "Other", in Question 13, as shown below:



PHOTO

**TÜRKİYE CUMHURİYETİ DIŞİŞLERİ BAKANLIĞI**
**REPUBLIC OF TURKEY, MINISTRY OF FOREIGN AFFAIRS**

http://www.mfa.gov.tr/mfa

## VISA APPLICATION FORM

| 1. Family name (as in passport) | 2. Maiden name | |
|---|---|---|
| 3. First name(s) (as in passport) | 4. Date of birth (year-month-day) | |
| 5. ID-number (optional) | 6. Sex ☐ Male ☐ Female | |
| 7. Place of birth City :.......................... Country.......................... | 8. Marital status: ☐ Single ☐ Married ☐ Separated ☐ Divorced ☐ Widowed ☐ Other | FOR OFFICIAL USE ONLY Date of application: |
| 9. Current citizenship | 10. Citizenship at birth | |
| 11. Father's full name | 12. Mother's full name | |

| 13. Type of passport ☐ Ordinary Passport ☐ Diplomatic Passport ☐ Service Passport | ☐ Travel Document (1951 Convention) ☐ Alien's passport ☐ Seaman's Passport ☐ Other (please specify)............................ | Supporting documents: Valid passport Financial means Invitation Means of transport Other: |
| 14. Passport number | 15. Issue and expiry date    16. Place of issue | |
| 17. If you are resident in a country other than your country of origin, have you permission to return to that country? ☐ No    ☐ Yes, (number and validity).......................... | | |

| 18. Present occupation and profession | | Visa: |
| 19. Present work address | Telephone/ Fax Number | ☐ Refused |
| | E-mail address | ☐ Granted |
| 20. Applicant's home address | Telephone number | |
| | E-mail address | |

| 21. Type of Visa: ☐ Transit ☐ Short stay ☐ Long stay | 22. Number of entries requested ☐ Single Entry ☐ Multiple entry |
| 23. Duration of stay- Visa is requested for : ................... days | |

*See* "Visa Form" link at http://www.mfa.gov.tr/sub.en.mfa?cc4e437c-6769-4d79-9017-10b63c651224 (last visited May 21, 2019).

51.     While Barkev is a naturalized United States citizen, he did not have a passport issued by the United States (or, for that matter, a valid passport issued by any other country) at the time he submitted the Application.  To date, he has no such passport.

52.     Irrespective, Barkev could not apply as a U.S. citizen.  On October 8, 2017, and in retaliation to the United States suspending visa services for Turkish citizens due to political conditions in Turkey, Defendant suspended all visa services to persons applying as U.S. citizens.

53.     In mid-November 2017, Defendant modified its suspension regime—but visa services remained suspended for U.S. citizens without residency in another country who were traveling from the United States to Turkey to visit (as opposed to traveling "in transit" through Turkish airports).

54.     This suspension remained in effect until December 28, 2017.

55.     Barkev did not have any residency abroad and, therefore, he did not apply as a U.S. citizen.

56.     Instead Barkev applied as an Armenian Christian born in Turkey seeking entry for the purpose of religious pilgrimage.

57.     On his Application, Barkev disclosed that he was born in Kaladouran, Turkey; that he is an Armenian Christian; that the purpose for his request for entry

was to make a religious pilgrimage; and that his expected date of arrival in Turkey was December 23, 2017.

58.     As required by the Application, Barkev also disclosed the fact that he has two sons, specifically identifying them by name—including his son Garo B. Ghazarian, the second plaintiff in this case.

59.     Barkev submitted his Application to the Turkish Embassy, Consular Section, in Washington D.C. on October 11, 2017—73 days prior to his expected date of arrival in Turkey.

60.     The Turkish Embassy received his Application on October 13, 2017—71 days prior to Barkev's expected date of arrival in Turkey.

*Defendant's Treatment of Barkev*

61.     Defendant's handling of Barkev's Application was patently inconsistent with standard procedures relating to visa applications.

62.     After sending the Application to the Embassy on October 11, 2017, Barkev awaited a response, but neither the Turkish Embassy nor its consular staff responded to him.

63.     Having confirmed the Embassy's receipt of his Application, and more than the thirty days having passed, Barkev sent a letter to the Embassy Consular Section by overnight courier on December 6, 2017, inquiring as to the status of the Application.

64.     The Embassy did not respond to Barkev for nearly another week.

65.     Then, on December 11, 2017, an individual identifying herself as "Güner" from the Embassy in Washington D.C. telephoned the business office of Barkev's son, Plaintiff Garo.  "Güner" left a message with an office assistant at Garo's office.

66.     "Güner" acknowledged receipt of Barkev's letter of December 6, 2017 and stated that "we" (the Embassy Consular Section) couldn't figure out what type of visa was being requested, a "J1 or a regular Turkish visa."

67.     Of course, the Application clearly identified the type of visa Barkev was seeking, specifically in response to Question 21: a "Short stay" visa.

68.     At no point during this call did "Güner" state that Barkev's Application was denied or contained any error or omission.

69.     Moreover, and even though it was Barkev who had submitted the Application, "Güner" called Barkev's son, Plaintiff Garo—and not Barkev.

70.     Upon receiving the message from his son Garo and wanting to document his response to the message left with his son's office, Barkev caused an email to be sent directly to the Turkish Embassy, Consular Section on December 18, 2017.

71.     In that email, Barkev emphasized that it had been over two months since he had submitted his Application.

72.   Barkev also underscored in that email that he was seeking entry to Turkey in order to exercise his religious rights and, of course, that time was of the essence for his religious pilgrimage.

73.   Five days remained until the date that Barkev had stated he would arrive in Turkey.  Barkev grew increasingly despondent.

74.   Three additional days passed—and there was no return phone call, no email and no communication from the Embassy or any of its consular staff.

75.   As such, on December 21, 2017, Barkev caused yet another letter to be sent to the Turkish Embassy, Consular Section, again by overnight delivery, attaching copies of his email correspondence of December 18, 2017, as well as another copy of the Application that was previously received by the Embassy on October 13, 2017.

76.   Barkev grew increasingly dejected as it appeared that his Application and his requests were being ignored, that he was being ridiculed and disregarded as a nonperson by the Embassy.

77.   There was no immediate response from the Embassy or its consular staff.

78.   Barkev, a man of advanced age then at 86 years old, grew overly anxious, highly disconsolate and extremely apprehensive.

79.   Then, on Friday, December 22, 2017, at approximately 4:20pm EST (1:20pm PST), the Embassy Consular Section sent an email to Barkev.

80.   In its December 22, 2017 email, the Embassy Consular Section disregarded Barkev's Application as submitted and received by the Embassy and directed Barkev to re-apply, required him to present a passport—and furnished him fee instructions on doing so as a United States citizen.

81.   Importantly, at no time—from the date of submission of his Application on October 11, 2017 to the date of the email from the Turkish Embassy on December 22, 2017—did any representative of Defendant, its Embassy or its consular staff inform Barkev that there was any error or omission in Barkev's Application.

82.   The Turkish Embassy did not grant Barkev's Application.   The Turkish Embassy did not formally deny Barkev's Application.

83.   Instead, Defendant's agents waited until that very last moment—when it would be effectively impossible for a then 86-year-old man to make an appointment with Defendant's consulate in time to board a flight on that same day, December 22, 2017, in order to arrive in Turkey on December 23, 2017, the arrival date stated in his Application, to make his religious pilgrimage.

84.   Defendant's agents ridiculed Barkev by providing him fee instructions on re-seeking entry as a U.S. citizen even though Defendant's agents

then knew that, at that time, Defendant was not granting visas to visit Turkey to any U.S. citizens without foreign residency.

85.   Defendant's agents harassed, agitated, confused and thwarted Barkev, intending to devalue his very identity as an Armenian Christian born in Turkey.

*The Targeted Policy*

86.   Defendant's agents' actions were neither consistent with Defendant's standard thirty-day stated visa application policy nor practicable given the prevailing visa regime Defendant maintained at the time.

87.   However, Defendant's agents' conduct was completely consistent with, and in strict furtherance of, a targeted policy (the "Targeted Policy") that has nothing to do with its visa application process *per se*—and everything to do with the fact that Barkev is a native Armenian Christian of Turkey.

88.   Mustafa Kemal Ataturk, the founder of the Defendant state, proclaimed in 1923:

> Armenians have no rights at all in this prosperous
> country. The land is yours, the land belongs to the Turks.
> In history this land was Turkish, therefore it is Turkish
> and will remain Turkish forever. The land has finally
> been returned to its rightful owners. The Armenians and

1    the others have no rights here at all. These blessed

2    regions are the native lands of the true Turks.

3    89.    Ataturk's image is portrayed on Defendant's Ministry of Foreign

4    Affairs website—the very website from which Barkev, an Armenian Christian,

5    downloaded the visa form application:



*See*   http://www.mfa.gov.tr/general-information-about-turkish-visas.en.mfa   (last visited May 21, 2019).

90.    By such proclamations, and then through a series of legislative, executive, administrative and other official and/or unofficial acts, Defendant established the Targeted Policy at the very founding of the Republic of Turkey.

91.    The core purpose of the Targeted Policy was to strip native Armenian Christians of their rights and identities by dehumanizing, degrading, expropriating, alienating, disenfranchising, liquidating and otherwise severing Armenian Christians from their native lands and their native customs and religious practices on such lands.

92.    This Targeted Policy has been pursued, institutionalized, enhanced and adhered to by Defendant's successive governments and agents.

93.    Allowing Barkev to seek entry into Turkey as a native Armenian Christian born in Turkey would patently affront the Targeted Policy.

94.    On the other hand, directing Barkev to reapply by giving him fee instructions on doing so as a U.S. citizen (even though Defendant knew that it would not grant Barkev a visa for entry as a U.S. citizen at that time), would be consistent with, and in furtherance of, its Targeted Policy.

95.    Defendant's Targeted Policy requires Defendant's agents in the United States to thwart, harass, confuse, degrade and humiliate native Armenian

Christians, like Barkev, seeking to exercise rights in Turkey as native Armenian Christians.

96.    Defendant has directed and continues to direct its agents, whether explicitly or implicitly, that no deviation or digression from its Targeted Policy is permitted.

97.    Defendant's agents acted consistently with the Targeted Policy in their dealings with Barkev and did so to thwart, harass, confuse, degrade and humiliate Barkev as a native Armenian Christian.

98.    Defendant's agents thwarted, ignored and ridiculed Barkev's attempts to return to his native Kaladouran as a native Armenian Christian to exercise religious rights.

99.    Defendant's agents thwarted, ignored and ridiculed Barkev's attempts to return to his native Kaladouran as a native Armenian Christian to pass knowledge of native religious and cultural traditions and ancestral pilgrimage sites to his son, Plaintiff Garo B. Ghazarian, and progeny.

100.    Barkev is the last living Ghazarian in his family line with direct knowledge of the specific sites in Ballum where he, his family and his ancestors had made pilgrimage for generations.

101.    Barkev is no longer been physically able to travel, and he has not been physically able to travel since late January 2018.

*Respondeat Superior*

102.   At all times relevant hereto, Defendant's agents, servants, employees and ostensible agents were the agents, servants, employees and ostensible agents of Defendant in the United States.

103.   At all times relevant hereto, the conduct of Defendant's agents, servants, employees and ostensible agents in the United States was being undertaken for the benefit of Defendant.

104.   The conduct of Defendant's agents, servants, employees and ostensible agents, in the United States, as set forth herein, was committed in the course and scope of delegated duties and authority granted by Defendant to its agents in the United States.

105.   Defendant is vicariously liable for such conduct of Defendant's agents, servants, employees and ostensible agents in the United States under the common law of the states, the federal common law, the law of California (Plaintiffs' state of residence) and international human rights law for the conduct of those agents, servants, employees and ostensible agents under the doctrine of *respondeat superior.*

## CAUSES OF ACTION

106.   The claims set forth herein are not about the grant or denial of a visa.

107.   The causes of action set out herein relate to Defendant's agents' abusive treatment of an elderly man, Plaintiff Barkev, in violation of statutory and common law in the United States as well as international human rights law.

108.   These violations have caused substantial injury to both Plaintiff Barkev and his son, Plaintiff Garo.

### FIRST CAUSE OF ACTION

### STATUTORY ELDER ABUSE

### (Barkev v. Defendant)

109.   Barkev incorporates by reference the matters alleged in Paragraphs 1 through 108 above.

110.   This cause of action is brought pursuant to the California Welfare & Institutions Code, Sections 15600 *et seq* (the "Elder Abuse Act").

111.   At the time of Defendant's agent's acts, Barkev was 86 years old and a resident of the State of California.  Barkev was an "elder" as defined by the Elder Abuse Act, Section 15610.27.

112.   Defendant's agents knew Barkev was an elder.

113.   Barkev is therefore entitled to the statutory protections from abuse, as such term is defined by Section 15610.07 of the Elder Abuse Act.

114.   Specifically, "abuse" under the Elder Abuse Act includes *inter alia* the treatment of an elder in such a manner that results in "physical harm or pain or mental suffering." Elder Abuse Act, Section 15610.07(a)(1).

115.   "Mental suffering" is specifically defined under the Elder Abuse Act to mean "fear, agitation, confusion, severe depression, or other forms of serious emotional distress that is brought about by forms of intimidating behavior, threats, harassment, or by deceptive acts performed or false or misleading statements made with malicious intent to agitate, confuse, frighten, or cause severe depression or serious emotional distress of the elder or dependent adult." Elder Abuse Act, Section 15610.53.

116.   "Abuse" under the Elder Abuse Act also includes the taking, secreting, appropriating, obtaining or retaining of the real or personal property of an elder, or assisting in the same, in a manner that is likely to be harmful to the elder. Elder Abuse Act, Sections 15610.07(a)(3) and 15610.30.

117.   Such abuse also includes the deprivation of "any property right" of the elder "regardless of whether the property is held directly or by a representative of an elder or dependent adult." Elder Abuse Act, Sections 15610.30©.

118.   Defendant's agents acted in such a manner as to harass, harm, degrade, deprive, confuse, agitate, insult, ridicule and otherwise abuse Barkev. Specifically, Defendant's agents:

    a.  ignored and refused to acknowledge Barkev's identity as a native Armenian Christian, knowing that such conduct would cause Barkev harm, pain and mental suffering;

    b.  intentionally delayed any decision on Barkev's Application for over 70 days (well outside Defendant's stated 30-day window) and then directed Barkev to "re-apply" on the afternoon of the very date on which Barkev needed to travel—at a time which would make it effectively impossible for an 86-year-old man to do so— in order to arrive in Turkey on December 23, 2017, as stated in his Application, in time for his religious pilgrimage and the Christian religious holidays[2], knowing that such conduct would cause Barkev harm, pain and mental suffering;

    c.  effectively instructed Barkev to apply for a visa that, in reality, would not be granted, knowing that such conduct would cause Barkev harm, pain and mental suffering;

---

[2] Armenian Apostolic Christians observe Holy Innocents' Day on December 28, Christmas Eve on January 5, Christmas Day on January 6, and the Day of the Dead on January 7.

    d.  actively thwarted Barkev's ability to return to his native ancestral lands and make religious pilgrimage to Ballum, knowing that such conduct would cause Barkev harm, pain and mental suffering; *and*

    e.  actively thwarted Barkev's ability to pass knowledge of his family's pilgrimage sites in Ballum to his son, Plaintiff Garo, and progeny, knowing that such conduct would cause Barkev harm, pain and mental suffering.

119. Defendant's agents' conduct in the course of their dealings with Barkev was intended to, and did in fact, cause Barkev both mental suffering and financial harm.

120. Defendant's agents harassed and degraded Barkev as a native Armenian Christian and confused and thwarted his attempts to return to his native ancestral lands as a native Armenian Christian to exercise religious rights.

121. Defendant's agents harassed and degraded Barkev as a native Armenian Christian and confused and thwarted his attempts to return to his native ancestral lands as a native Armenian Christian to pass native religious and cultural traditions to his son, Plaintiff Garo, and progeny.

122. Defendant's agents' conduct was intended to humiliate and ridicule Barkev as a native Armenian Christian and to make him feel inferior, intimidated,

agitated, meaningless and powerless in his dealings with Defendant as a native Armenian Christian and, in fact, did make Barkev feel as such.

123. Defendant's agents' conduct attacked Barkev's very dignity and identity as a native Armenian Christian born in Turkey and caused Barkev serious emotional distress.

124. Defendant's agents' conduct was undertaken consistent with Defendant's Targeted Policy from which Defendant's agents were not permitted to digress and/or deviate.

125. Defendant's agents' conduct was wholly within the scope of their employment with, and for the benefit of, Defendant.

126. Defendant's agents' acts were willful, reckless, wanton, malicious and oppressive.

127. Defendant is responsible for elder abuse because Defendant's agents' treatment of Barkev, as described above, was in violation of the California Elder Abuse Act, Section 15610.07(a)(1) and (a)(3), and resulted in physical harm, mental suffering and financial damage to Barkev.

128. As a result of Defendant's agents' conduct, Barkev suffered damages, in an amount to be proven at trial, including general and economic damages. Barkev has also incurred, and will continue to incur, attorneys' fees and costs in this litigation.

*Prayer for Relief—First Cause of Action*

Wherefore, Plaintiff BARKEV GHAZARIAN respectfully requests that this Honorable Court award judgment in his favor and against Defendant as follows:

A.   Compensatory damages in an amount to be proven at trial;

B.   Costs of suit incurred herein, pursuant to Elder Abuse Act, Section 15657.5(a) or (b), in an amount to be determined by the Court;

C.   Reasonable attorneys' fees pursuant to Elder Abuse Act, Section 15657.5(a) or (b), in an amount to be determined by the Court; and

D.   Such other relief as the Court may deem just and proper.

## SECOND CAUSE OF ACTION

### INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

### (Barkev v. Defendant)

129.   Barkev incorporates by reference the matters alleged in Paragraphs 1 through 108 above.

130.   Defendant's agents knew that Barkev is a native Armenian Christian who sought to exercise his religious rights and native customs in Turkey.

131.   Defendant's agents knew Barkev's age, the fact that he was a native Armenian Christian born in Kaladouran, Turkey and the fact that he had progeny.

132.   Defendant's agents also knew that Barkev would not be granted entry to Turkey as a U.S. citizen at the time of his Application.

133.   However, in their dealings with Barkev, Defendant's agents acted in such a manner as to harass, harm, degrade, insult, deprive and otherwise abuse Barkev including in the manner described in Paragraphs 118 through 126, which are incorporated herein by reference.

134.   The above-referenced conduct by Defendant's agents, as described in Paragraphs 118 through 126, which are incorporated herein by reference, was intentional and malicious and done for the purpose of causing Barkev to suffer mental anguish, emotional harm and physical distress.

135.   Defendant's agents' conduct was intended to humiliate and ridicule Barkev as a native Armenian Christian and to make him feel inferior, meaningless and powerless in his dealings with Defendant.

136.   In fact, Defendant's agents' conduct did make Barkev feel inferior, meaningless and powerless in his dealings with Defendant as a native Armenian Christian.

137.   Defendant's agents harassed and degraded Barkev as a native Armenian Christian and thwarted his attempts to return to his native ancestral lands as a native Armenian Christian to exercise religious rights.

138.   Defendant's agents harassed and degraded Barkev as a native Armenian Christian and thwarted his attempts to return to his native ancestral lands

as a native Armenian Christian to pass native religious and cultural traditions to his son, Plaintiff Garo, and progeny.

139.   Defendant's agents' conduct attacked Barkev's very dignity and identity as a native Armenian Christian born in Turkey.

140.   Defendant's agents' conduct was undertaken consistent with, and in furtherance of, Defendant's Targeted Policy from which Defendant's agents were not permitted to digress and/or deviate.

141.   Defendant's agents' conduct was wholly within the scope of their employment with, and for the benefit of, Defendant.

142.   As a result of these acts by Defendant's agents, Barkev suffered mental anguish and emotional and physical distress.

*Prayer for Relief—Second Cause of Action*

Wherefore, Plaintiff BARKEV GHAZARIAN respectfully requests that this Honorable Court award judgment in his favor and against Defendant as follows:

A.   Compensatory damages in an amount to be determined by the Court;

B.   Costs of suit incurred herein, in an amount determined by the Court;

C.   Reasonable attorneys' fees pursuant, in an amount determined by the Court, to the extent permitted under Federal Rule of Civil Procedure 54(d)(2); and

D.   Such other relief as the Court may deem just proper.

## **THIRD CAUSE OF ACTION**

## **VIOLATION OF INTERNATIONAL LAW**

## **(Barkev v. Defendant)**

143.   Barkev incorporates herein by reference the matters alleged in Paragraphs 1 through 108 above.

144.   Defendant's agents' conduct with respect to Plaintiff Barkev was a gross violation of well-established, universally recognized norms of international human rights law.

145.   Such international law of human rights—specifically with regard to the protection of the rights and dignity of the elderly and/or native peoples—has been codified in various international agreements *inter alia*:

    a.  The United Nations Declaration of Human Rights;

    b.  The United Nations Principles for Older Persons;

    c.  The Treaty of Lausanne, *ratified by Turkey in 1923*;

    d.  The European Convention on Human Rights, *ratified by Turkey in 1954;*

    e.  International Covenant on Economic, Social and Cultural Rights, *ratified by Turkey in 2003;*

    f.  Vienna International Plan of Action on Ageing, *adopted by the United Nations Member States in 1982;*

g.  The Madrid International Plan on Ageing, *with Turkey voting in favor of adoption in April 2002*; *and*

h.  United Nations Declaration on the Rights of Indigenous Peoples, *with Turkey voting in favor of adoption on 13 September 2007.*

146.  Defendant has affirmatively adopted and/or ratified certain of these international agreements including the Treaty of Lausanne, the European Convention on Human Rights, the Madrid International Plan on Ageing and the U.N. Declaration on the Rights of Indigenous Peoples.

147.  Defendant even displays links to certain of these international agreements on its Foreign Ministry website published in the United States, the same website which provides a download for the visa application itself:



*See*   http://www.mfa.gov.tr/sub.en.mfa?2f933bfc-9d4a-4c2b-976c-ee78111fa71f (last visited on May 21, 2019).

148.   Moreover, and in such cases where Defendant has not affirmatively adopted specific international agreements, the acceptance of various international agreements by the international community generally demonstrates that certain of the provisions of such international agreements have attained the status of customary international law, as they codify long-standing legal human rights norms reflecting the actual practices of states in prohibiting the abuse of elderly persons and/or protecting the religious and cultural traditions of native peoples.

149.   These principles of customary international law are not so novel as to be considered outside the bounds of what is customary; they are of universal concern.

150.   The practices, instructions, mandates and dictates of Defendant's agents in the United States in abusing the elderly Barkev, whether undertaken under the color of law or otherwise, are violations of customary international law for which the law of nations attributes individual responsibility.

151.   The practices, instructions, mandates and dictates of Defendant's agents in the United States in subverting Barkev's efforts to practice his native religious and cultural traditions on his ancestral lands, whether undertaken under

the color of law or otherwise, are violations of customary international law for which the law of nations attributes individual responsibility.

152.    The practices, instructions, mandates and dictates of Defendant's agents in the United States in subverting Barkev's ability to pass on to his son, Plaintiff Garo, and progeny his native religious and cultural traditions, whether undertaken under the color of law or otherwise, are violations of customary international law for which the law of nations attributes individual responsibility.

153.    Defendant's agents' conduct was undertaken consistent with, and in furtherance of, Defendant's Targeted Policy from which Defendant's agents were not permitted to digress and/or deviate.

154.    Defendant's agents' acts were willful, wanton, malicious and oppressive.

155.    Defendant's agents' conduct was wholly within the scope of their employment with, and for the benefit of, Defendant.

*Prayer for Relief—Third Cause of Action*

Wherefore, Plaintiff BARKEV GHAZARIAN, respectfully requests that this Honorable Court award judgment in his favor and against Defendant as follows:

A.    Compensatory damages in an amount to be determined by the Court;

B.    Costs of suit incurred herein, in an amount determined by the Court;

C. Reasonable attorneys' fees pursuant, in an amount determined by the Court, to the extent permitted under Federal Rule of Civil Procedure 54(d)(2); and

D. Such other relief as the Court may deem just proper.

## FOURTH CAUSE OF ACTION

### BREACH OF FIDUCIARY DUTY

### (Barkev v. Defendant)

156. Barkev incorporates herein by reference the matters alleged in Paragraphs 1 through 108 above.

157. Defendant's agents knew that Barkev is a native Armenian Christian born in Kaladouran, Turkey.

158. Defendant has effective control over the native pilgrimage sites at Ballum where Barkev and his ancestors practiced native religious and cultural traditions.

159. Defendant's agents knew that Defendant has effective control over the native pilgrimage sites at Ballum and that Barkev and his ancestors practiced native religious and cultural traditions there.

160. Plaintiff Barkev incorporates herein by reference the matters alleged in Paragraphs 144 through 149.

161.   Plaintiff, an Armenian Christian born in Turkey, is a member of a protected class of persons toward whom Defendant owes a duty under various international agreements, customary international law and/or long-standing human rights law, such that a special relationship exists between Plaintiff and Defendant in the nature of a fiduciary relationship.

162.   Defendant owed a fiduciary duty to Barkev to act with the utmost good faith toward, and for the benefit of, Barkev with respect to Barkev's efforts to exercise his native religious and cultural traditions at native pilgrimage sites in Turkey.

163.   Defendant owed a fiduciary duty to act with the utmost good faith for the benefit of Barkev, as Barkev is someone who must rely upon Defendant's integrity to voluntarily act in Barkev's interest so that Barkev may exercise his native religious and cultural traditions at native pilgrimage sites in Turkey.

164.   Defendant breached such duty when its agents subverted and thwarted Barkev's attempts to return to his ancestral lands as a native Armenian Christian to exercise his native religious and cultural traditions.

165.   Defendant breached such duty when its agents subverted and thwarted Barkev's attempts to return to his ancestral lands as a native Armenian Christian to pass native religious and cultural traditions to his son, Plaintiff Garo, and progeny.

166.   Defendant's agents' conduct has caused Barkev significant damage, permanently preventing him from ever exercising his native religious and cultural traditions in Ballum, as Barkev's health has deteriorated considerably over the last year and a some months and he is no longer physically able to travel to Turkey and has not been able to so travel since late January 2018.

167.   Defendant's agents' conduct has caused Barkev significant damage, permanently preventing him from ever being able to pass his native and ancestral religious and cultural traditions to his son, Plaintiff Garo, and progeny, as Barkev's health has deteriorated considerably over the last year and some months and he is no longer physically able to travel to Turkey and has not been able to so travel since late January 2018.

168.   But for Defendant's agents' conduct, Barkev would have been able to exercise his native religious and cultural traditions in Ballum.

169.   But for Defendant's agents' conduct, Barkev would have been able to pass his native religious and cultural traditions to his son, Plaintiff Garo, and his progeny, just as his own ancestors had done to their own sons for centuries.

170.   In fact, by their conduct, Defendant's agents have permanently deprived Barkev, his son Plaintiff Garo, and their descendants the ability to pass knowledge of the native traditions and ancestral pilgrimage sites, which had been known to generations of Ghazarian ancestors before Barkev.

171. By their conduct, Defendant's agents have destroyed a valuable component of Plaintiff Barkev Ghazarian's and Plaintiff Garo Ghazarian's ancestral heritage.

172. Defendant's agents' conduct was undertaken consistent with, and in furtherance of, Defendant's Targeted Policy from which Defendant's agents were not permitted to digress and/or deviate.

173. Defendant's agents' acts were willful, wanton, malicious and oppressive.

174. Defendant's agents' conduct was wholly within the scope of their employment with, and for the benefit of, Defendant.

### *Prayer for Relief—Fourth Cause of Action*

Wherefore, Plaintiff BARKEV GHAZARIAN respectfully requests that this Honorable Court award judgment in his favor and against Defendant as follows:

A. Compensatory damages in an amount to be determined by the Court;

B. Costs of suit incurred herein, in an amount determined by the Court;

C. Reasonable attorneys' fees pursuant, in an amount determined by the Court, to the extent permitted under Federal Rule of Civil Procedure 54(d)(2); and

D. Such other relief as the Court may deem proper.

## **FIFTH CAUSE OF ACTION**

### **INTENTIONAL INTERFERENCE**

### **WITH EXPECTATION OF INHERITANCE**

### **(Garo v. Defendant)**

175.   Plaintiff Garo incorporates by reference the matters alleged in Paragraphs 1 through 108 above.

176.   Barkev wanted and sought to pass certain native traditions of the Ghazarian family, including his direct knowledge of the cultural and religious customs practiced by generations of Ghazarians at specific sacred pilgrimage sites in Ballum, to his own son, Plaintiff Garo Ghazarian.

177.   Barkev Ghazarian had inherited such native traditions from his father, Guiragos Ghazarian.

178.   Guiragos Ghazarian (1905-1988), also born in Kaladouran, had inherited these native traditions from his father, Aristakes Ghazarian.

179.   Aristakes Ghazarian (1874-1952), also born in Kaladouran, had inherited these native traditions  from his father, Ghazar Ghazarian.

180.   Ghazar Ghazarian (1846-1906), also born in Kaladouran, had inherited these native traditions from his father, Panos Ghazarian.

181.   Panos Ghazarian (1822-1916), also born in Kaladouran, had inherited these native traditions from his father, Ghazar Ghazarian (1792-unknown), who was also born in Kaladouran, and so on.

182.   Plaintiff Garo had an expectancy to receive such inheritance from his father Barkev, just as each of his ancestors had received such inheritance from each's own father.

183.   Defendant's agents knew or should have known that Barkev was an Armenian Christian from Kaladouran who could pass his knowledge of his Armenian Christian family's native traditions and ancestral pilgrimage sites—a valuable, indeed priceless, inheritance—to his son, Plaintiff Garo.

184.   Defendant's agents knew or should have known that Barkev would try to pass on knowledge of such native traditions and pilgrimage sites to his son, Plaintiff Garo.

185.   Despite such knowledge, Defendant's agents took deliberate action to interfere with Barkev's passing of such knowledge of the Ghazarian family's native traditions and pilgrimage sites to his progeny including his son, Plaintiff Garo.

186.   Defendant's agents interfered with Plaintiff Garo's expectancy.

187.   Specifically, Defendant's agents intentionally subverted and thwarted Plaintiff Barkev as described in Paragraphs 118, 120, 121, 137, 138, 150, 151, 152,

164 and 165, incorporated herein by reference, and thereby deprived Plaintiff Garo the expectancy of direct knowledge of the native traditions and ancestral pilgrimage sites which had been known to generations of his Ghazarian forefathers before him.

188.   But for Defendant's agents' conduct, Barkev would have been able to identify the Ghazarian family's specific prayer sites in Ballum for his son, Plaintiff Garo.

189.   But for Defendant's agents' conduct, Barkev would have been able to convey his direct knowledge of the native traditions as practiced at such ancestral pilgrimage sites in Turkey and fulfill Garo's expectancy.

190.   Defendant's agents' interference with Garo's expectancy was tortious and wrongful.

191.   Garo has sustained damage because Defendant's agents' conduct has thwarted his expected inheritance, effectively preventing Garo from ever receiving such knowledge of his family's native traditions and ancestral pilgrimage sites in Ballum and on his family's ancestral lands.

192.   Defendant's agents' conduct has ensured that Barkev's direct knowledge of the Ghazarian family's native traditions and ancestral pilgrimage sites in Ballum and on his family's ancestral lands will not be passed down to Garo or future generations of Ghazarians.

193.   Barkev's health has deteriorated considerably, and he is no longer physically able to travel to Turkey and has not been physically able to travel since late January 2018.

194.   Defendant's agents' conduct was undertaken consistent with its Targeted Policy from which Defendant's agents were not permitted to digress and/or deviate.

195.   Defendant's agents' acts were willful, wanton, malicious and oppressive.

196.   Defendant's agents' conduct was wholly within the scope of their employment with, and for the benefit of, Defendant.

*Prayer for Relief—Fifth Cause of Action*

Wherefore, Plaintiff GARO B. GHAZARIAN respectfully requests that this Honorable Court award judgment in his favor and against Defendant as follows:

A.   Compensatory damages in an amount to be determined by the Court;

B.   Costs of suit incurred herein, in an amount determined by the Court;

C.   Reasonable attorneys' fees pursuant, in an amount determined by the Court, to the extent permitted under Federal Rule of Civil Procedure 54(d)(2); and

D.   Such other relief as the Court may deem just and proper.

Dated:  May 29, 2019                    Respectfully submitted,

                                        BARKEV GHAZARIAN and
                                        GARO B. GHAZARIAN

                                        */s/ Gayane Khechoomian*

                                        GAYANE KHECHOOMIAN (SBN 296673)
                                        201 N. Brand Blvd., Suite 200
                                        Glendale, California 92203-3590
                                        Telephone: (818) 454-0446
                                        Email: gayane.khechoomian@gmail.com

                                        KARNIG KERKONIAN
                                        *(motion for leave to appear pro hac vice*
                                        *forthcoming)*
                                        ELIZABETH AL-DAJANI
                                        (*motion for leave to appear pro hac vice*
                                        *forthcoming*)
                                        KERKONIAN DAJANI LLC
                                        1555 Sherman Avenue, Suite 344
                                        Evanston, Illinois 60201
                                        Telephone: (312) 416-6180
                                        Facsimile: (312) 604-7815
                                        Email: kkerkonian@kerkoniandajani.com
                                        Email: ealdajani@kerkoniandajani.com

                                        *Attorneys for Plaintiffs*

COMPLAINT – 44