KARNIG KERKONIAN (pro hac vice)
kkerkonian@kerkoniandajani.com
ELIZABETH AL-DAJANI (pro hac vice)
ealdajani@kerkoniandajani.com
KERKONIAN DAJANI LLP
1555 Sherman Avenue, Suite 344
Evanston, Illinois 60201
Telephone: (312) 416-6180
Facsimile: (312) 604-7815

GAYANE KHECHOOMIAN (Bar No. 296673)
gayane.khechoomian@gmail.com
201 N. Brand Blvd., Suite 200
Glendale, California 92203-3590
Telephone: (818) 454-0446

# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| BARKEV GHAZARIAN and GARO B. GHAZARIAN, | Case No.: 2:19-cv-4664 |
| Plaintiffs, | |
| v. | **PLAINTIFFS' MOTION FOR DEFAULT JUDGMENT** |
| Republic of Turkey, | |
| Defendant. | |

PLAINTIFFS' MOTION FOR DEFAULT JUDGMENT

1 | Dated: May 21, 2021

2

Respectfully submitted,

BARKEV GHAZARIAN and
GARO B. GHAZARIAN

*/s/Gayane Khechoomian*

KARNIG KERKONIAN (pro hac vice)
kkerkonian@kerkoniandajani.com
ELIZABETH AL-DAJANI (pro hac vice)
ealdajani@kerkoniandajani.com
KERKONIAN DAJANI LLP
1555 Sherman Avenue, Suite 344
Evanston, Illinois 60201
Telephone: (312) 416-6180
Facsimile: (312) 604-7815

GAYANE KHECHOOMIAN
(Bar No. 296673)
gayane.khechoomian@gmail.com
201 N. Brand Blvd., Suite 200
Glendale, California 92203-3590
Telephone: (818) 454-0446

*Attorneys for Plaintiffs*

1

## **<u>TABLE OF CONTENTS</u>**

2

INTRODUCTION....................................................................................... 1

3

PROCEDURAL BACKGROUND ............................................................. 2

4

FACTUAL BACKGROUND ..................................................................... 2

5

JURISDICTION AND VENUE ............................................................... 13

6

ARGUMENT ........................................................................................... 14

7

8        I. TURKEY HAS VIOLATED THE CALIFORNIA ELDER ABUSE ACT

9        .............................................................................................................. 14

10       II. TURKEY INTENTIONALLY INFLICTED EMOTIONAL DISTRESS

11       ON PLAINTIFF BARKEV GHAZARIAN ................................................ 18

12

13       III. TURKEY INTENTIONALLY INTERFERED WITH PLAINTIFF

14       GARO GHAZARIAN'S EXPECTATION OF INHERITANCE ............... 21

15       CONCLUSION ........................................................................................ 24

16

17

18

19

20

21

22

23

24

25

26

27

28

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# <u>TABLE OF AUTHORITIES</u>

**CASES**:

*Alabama-Tombigbee Rivers Coalition v. Kempthorne,*
   477 F.3d 1250 (11th Cir. 2007)...........................................................................23

*Beckwith v. Dahl*,
   205 Cal. App. 4th 1039 (2012)..........................................................21, 22, 23

*Bikkina v. Mahadevan*,
   241 Cal. App. 4th 70  (2015)..............................................................................19

*Bonfigli v. Strachan*,
   192 Cal. App. 4th 1302 (2011)..........................................................................15

*California Cap. Ins. Co. v. Maiden Reinsurance N. Am., Inc.*,
   472 F. Supp. 3d 754, 758 (C.D. Cal. 2020) ....................................................24

*Christensen v. Superior Ct.*,
   54 Cal. 3d 868 (1991)........................................................................................18

*Darrin v. Miller*,
   32 Cal. App. 5th 450 (2019)..............................................................................15

*Dillon v. Legg*,
   68 Cal.2d 728 (1968).........................................................................................23

*Doe v. Holy See*,
   557 F.3d 1066 (9th Cir. 2009)...........................................................................14

*Exec. Benefits Ins. Agency v. Arkison*,
   573 U.S. 25 (2014) ............................................................................................22

*Foley v. Interactive Data Corp.*,
   47 Cal. 3d 654, 765 P.2d 373 (1988) ........................................................19, 24

*Gonzales v. Pers. Storage, Inc.*,

    56 Cal. App. 4th 464 (1997)...............................................................19-20, 22

*Guz v. Bechtel Nat. Inc.*,

    24 Cal. 4th 317, 8 P.3d 1089 (2000) ...................................................... 19

*Hailey v. California Physician' Serv.*,

    158 Cal. App. 4th 452 (2007)................................................................ 19

*Homeowners Ass'n v. United Pac. Ins. Co.*,

    219 F.3d 895 (9th Cir. 2000) ................................................................ 17

*Huber v. Standard Ins. Co.*,

    841 F.2d 980 (9th Cir. 1988) ................................................................ 19

*Hunt v. Phinney*,

    177 Cal. App. 2d 212 (1960)................................................................ 22

*In re Bellingham Ins. Agency, Inc.*,

    702 F.3d 553 (9th Cir. 2012)................................................................ 22

*In re Watman*,

    301 F.3d 3, 12 (1st Cir. 2002) .............................................................. 22

*KOVR-TV, Inc. v. Superior Ct.*,

    31 Cal. App. 4th 1023 (1995) .............................................................. 19

*Little v. Stuyvesant Life Ins. Co.*,

    67 Cal. App. 3d 451, 465 (Ct. App. 1977) ........................................... 21

*Long v. PKS, Inc.*,

    12 Cal. App. 4th 1293 (1993)............................................................... 17

*Meagher v. Lamb-Weston, Inc.*,

    839 F. Supp. 1403 (D. Or. 1993).......................................................... 19

iii

TABLE OF AUTHORITIES

*Metz v. Soares,*

    142 Cal. App. 4th 1250 (2006)..................................................................24

*Miller v. Nat'l Broad. Co.,*

    187 Cal. App. 3d 1463 (Ct. App. 1986) ..............................................19

*Negrete v. Allianz Life Ins. Co. of N. Am.,*

    927 F. Supp. 2d 870 (C.D. Cal. 2013) ................................................18

*Rulon-Miller v. Int'l Bus. Machines Corp.,*

    162 Cal. App. 3d 241 (Ct. App. 1984).................................... 19, 20, 21

*Pershing Park Villas Homeowners Ass'n v. United Pac. Ins. Co.,*

    219 F.3d 895 (9th Cir. 2000)............................................................ 17

*Plotnik v. Meihaus,*

    208 Cal. App. 4th 1590 (2012)...........................................................21

*Sabow v. United States,*

    93 F.3d 1445 (9th Cir. 1996)...............................................................18

 *Shamoun v. Republic of Iraq,*

    441 F. Supp. 3d 976 (S.D. Cal. 2020) ................................................14

*Turner v. Imperial Stores,*

    161 F.R.D. 89 (S.D. Cal. 1995) ..........................................................18

*Tanguilig v. Valdez,*

    36 Cal. App. 5th 514 (2019)...............................................................15


**STATUTES:**

28 US.C. § 1391(f)(1) ..............................................................................13

28 U.S.C. § 1605(a)(5)(A) .......................................................................14

Cal. Civ. Code, § 1708 ............................................................... 23

Cal. Civ. Code, § 3523 ................................................................ 23

California Elder Abuse Act, Cal. Welf. & Inst. Code § 15600 *et. seq.*.............15-18

Fed. R. Civ. P. 54(d) ........................................................ 18, 21, 24, 25

Foreign Sovereign Immunities Act, 28 U.S.C. § 1608 *et. seq.* ................................ 2

**INTRODUCTION**

The Court entered default against Defendant Republic of Turkey ("Turkey") in this case and provided Plaintiffs until May 21, 2021, to file their default judgment motion. Plaintiffs hereby file their motion and respectfully move this Court to grant default judgment on three counts in their Complaint: Count 1 (Violation of the California Elder Abuse Act), Count 2 (Intentional Infliction of Emotional Distress), and Count 5 (Intentional Interference with Expected Inheritance). In addition, Plaintiffs respectfully request that this Honorable Court enter an award of compensatory damages in their favor and against Defendant Turkey in the amount of $200,160.12 and award Plaintiffs costs in the amount of $9,610.

Plaintiff Barkev Ghazarian sought return to Turkey as a native Armenian Christian for the purpose of a religious pilgrimage. He wanted to identify his family's sacred and centuries-old altars at a special holy site in Turkey, and to pass such native knowledge and indigenous heritage of this holy site to his son, Plaintiff Garo B. Ghazarian. Barkev did not want this native knowledge and heritage, passed down to him by generations of his forefathers, to die with him. Defendant Turkey schemed, in patent bad faith, to ensure that it would.

Turkey did not adjudicate Barkev's visa application—and, importantly, this is ***not*** what Plaintiffs are asking this Court to do here. Rather, Barkev is asking this Court to hold Turkey liable for its malicious treatment of him in the process and Turkey's attempt, consistent with a targeted state policy, to degrade and demean him. Plaintiff Garo seeks judgment against Turkey for its interference with the transfer of his valuable inheritance, the specific details of his family's native Christian Armenian heritage at this revered holy site in Turkey. By its own actions, Defendant Turkey

violated California statutory and common law, as such, judgment in favor of Plaintiffs and against Defendant Turkey is warranted.

## PROCEDURAL BACKGROUND

This matter has been pending before the Court since May 2019. Defendant Turkey has been aware of this case since at least September 17, 2019, when it rejected service under the Hague Convention. ECF 21-2. Plaintiffs proceeded with service by the means required, and in the order required, by the Foreign Sovereign Immunities Act ("FSIA"), 28 U.S.C. § 1608(a) *et seq*. Plaintiffs properly served Defendant Turkey by diplomatic means on October 13, 2020. ECF 41. Statutorily, Turkey was afforded 60 days to respond to Plaintiff's Complaint. 28 U.S.C. § 1608(d); ECF 44. It failed to respond. ECF 44. After service upon Turkey was made known, and more than 6 months after such service had passed, this Court entered default against Turkey on April 19, 2021. ECF 44.

In the meantime, Plaintiffs learned that Turkey actively sought to circumvent these proceedings, and to undermine this Court's independence, by requesting the State Department exert political pressure on this Court to summarily dismiss this case. ECF 40 at 12-13; ECF 40-3. A Turkish diplomatic note, obtained by Plaintiffs from the State Department and presented to this Court, evidences this plainly. ECF 40-3. A request to the State Department is not a responsive pleading. ECF 44.

## FACTUAL BACKGROUND

Plaintiffs incorporate herein the facts as alleged in the Complaint. ECF 1. As alleged therein, Plaintiff Barkev Ghazarian is an Armenian Christian born in 1931 in a village called Kaladouran, then-situated in the brackish borderland between Turkey and Syria. Declaration of Barkev Ghazarian, attached hereto as Exhibit A ("Barkev

Decl.") ¶ 4. Barkev, his parents, his grandparents and their forefathers are, and were, all native Kaladouran Armenians. *Id.* The Ghazarian family's ancestral ties to Kaladouran trace back several generations, centuries in fact—and well prior to the founding of the Republic of Turkey. Barkev Decl. ¶¶ 5, 7; Declaration of Hagop Tcholakian, attached hereto as Exhibit E ("Tcholakian Decl."), ¶¶ 6, 11.

*The Village of Kaladouran*

In the 1930s, the village of Kaladouran was populated by Armenian Christians. Barkev Decl. ¶ 7; Tcholakian Decl. ¶ 7. It consisted of several "neighborhoods," each one named after the Armenian family clan which occupied that neighborhood. Barkev Decl. ¶ 8; Tcholakian Decl. ¶ 11. One of those neighborhoods, *Ghezellek,* was named after the Ghazarians. Barkev Decl. ¶ 8; Tcholakian Decl. ¶ 11. The Ghazarian family had farmlands and fields of harvest in Kaladouran, Turkey. Barkev Decl. ¶ 9. They grew wheat and tobacco on their farms and owned herds of livestock. *Id.* ¶ 11.

Barkev and his family attended one of the Armenian churches in Kaladouran named *Sourp Asdvadzadzin* ("Holy Mother of God"). *Id.* ¶ 13. Barkev attended the Mesrobian Armenian National School in Kaladouran until the third grade, the same school where his father was a schoolteacher. *Id.* ¶ 14, Ex. A5. Barkev swam and fished at the Kaladouran seashore along the Mediterranean Sea as a child. *Id.* ¶ 15, Exs. A6, A7, A8. Barkev, his parents, his grandparents and their forefathers lived as native Kaladouran Armenians, buried their ancestors in Kaladouran, tilled and toiled in the fields of Kaladouran, grazed livestock in the pastures of Kaladouran and practiced their faith in Kaladouran consistent with the specific customs and traditions developed over many generations. *Id.* ¶ 9; Tcholakian Decl. ¶ 15; Declaration of Heghnar Watenpaugh, attached hereto as Exhibit F ("Watenpaugh Decl."), ¶ 4.

- 3 -

*Baptism and Pilgrimage to Ballum*

Baptism is one of the most important sacraments of the Christian faith. Watenpaugh Decl. ¶ 6; Tcholakian Decl. ¶ 13. For Armenian Christians, it has been so for more than a millennium. Watenpaugh Decl. ¶ 4; Tcholakian Decl. ¶ 13. As an Armenian Christian from Kaladouran, Barkev was baptized at a sacred ceremonial site in Ballum, Turkey, in 1931, under the auspices of the Armenian Apostolic Church of Kaladouran. Barkev Decl. ¶¶ 3, 19, Ex. A1; Tcholakian Decl. ¶ 14.

Ballum is the site of a 5th-6th century monastery built on the slopes of Mount Cassius, located a short distance east/northeast of Kaladouran. Barkev Decl. ¶ 17 and Ex. A9; Tcholakian Decl. ¶ 14; Declaration of Aris Nalci, attached hereto as Exhibit G ("Nalci Decl."), ¶¶ 6-7. For centuries, it was the communal pilgrimage site for the native Armenian Christians on the Feast of Assumption of the Holy Mother of God and other important events. Barkev Decl. ¶ 18; Tcholakian Decl. ¶ 16; Watenpaugh Decl. ¶ 5. Barkev and his family would make the pilgrimage to Ballum, together with other Kaladouran Armenian families and the village priests, for prayer and the ceremonial blessing of the grapes. Barkev Decl. ¶ 16-22; Watenpaugh Decl. ¶ 6, 14. They would often make the journey by mule, packing the mules with food, blankets and other provisions. Barkev Decl. ¶¶ 20-21. They would sleep overnight at the pilgrimage site, under make-shift tents, for events like baptisms, weddings and the Feast of the Assumption of the Holy Mother of God. Barkev Decl. ¶ 21; Tcholakian Decl. ¶ 16; Watenpaugh Decl. ¶¶ 5, 14. Barkev recalls the ritual feasts and customs they would share at Ballum with other Armenian families from Kaladouran. Barkev Decl. ¶ 21; Tcholakian Decl. ¶ 16; Watenpaugh Decl. ¶¶ 5-6, 18.

*A Climate of Fear and Violence*

There was much fear and tension during the last few pilgrimages to Ballum in the late 1930s because of threats and violence by Turks against Armenians from villages of Kessab. Barkev Decl. ¶ 24; Tcholakian Decl. ¶ 17. Turks would affront and accost Armenians along the roads in the Kessab villages, including near Kaladouran; Turkish officers and soldiers pillaged the Kessab market and targeted and beat Armenian villagers, some to near death. Barkev Decl. ¶ 29; Tcholakian Decl. ¶ 17. The threats and fear of violence—against Armenians who had survived documented Turkish atrocities and deportation from their villages in 1909 and then the Armenian Genocide between 1914-1918—had grown manifest by the late 1930s. Barkev Decl. ¶¶ 23, 29; Tcholakian Decl. ¶ 17. Barkev grew up in 1930s Kaladouran fearing violence, harm and even death at the hands of Turkish *gendarmes*. Barkev Decl. ¶¶ 24-28, 30; Tcholakian Decl. ¶ 17.

### *The 1939 Demarcation and the Separation from Ballum*

In 1939, Kaladouran was divided by a new border between Turkey and Syria. Barkev Decl. ¶ 31; Tcholakian Decl. ¶ 19. The new demarcation line split the Armenian village of Kaladouran into two parts. Barkev Decl. ¶ 31; Tcholakian Decl. ¶ 20. Thereafter, Barkev's home, and those of other Kaladouran Armenians, would be on the Syrian side of the new demarcation line, while his family's crop fields and meadowlands would remain on the Turkish side. Barkev Decl. ¶ 31; Tcholakian Decl. ¶ 20. Significantly, what remained on the Turkish side was thereafter inaccessible to the Kaladouran Armenians. Barkev Decl. ¶ 32; Tcholakian Decl. ¶ 20. The border was patrolled by armed Turkish border guards, and the Kaladouran Armenians were not permitted to cross the border to their native lands. Barkev Decl. ¶ 32; Tcholakian

Decl. ¶ 20. Armenians who did attempt to cross were immediately killed by the Turkish border guards. Barkev Decl. ¶ 33; Tcholakian Decl. ¶ 21.

Ballum also was left on the Turkish side of the demarcation line. Barkev Decl. ¶ 34; Tcholakian Decl. ¶ 20. After the division of frontiers in 1939, Barkev and the other Kaladouran Armenians could not cross the Turkish-patrolled borderline to make pilgrimage to Ballum. Barkev Decl. ¶¶ 32-34; Tcholakian Decl. ¶¶ 20-21. Even approaching the Turkish-patrolled frontier meant the risk of kidnapping or killing by Turkish border guards. Barkev Decl. ¶ 34; Tcholakian Decl. ¶ 21. After 1939, Barkev could not return to his family's lands that remained on the Turkish side, and he could not make pilgrimages to Ballum again. Barkev Decl. ¶ 34; Tcholakian Decl. ¶ 20. Tourists were not even permitted to visit Ballum Monastery until 2011. Tcholakian Decl. ¶ 20.[1] Barkev last made the devotional pilgrimage to Ballum in 1939, when he was approximately 8 years old. Barkev Decl. ¶ 22.

*Barkev Decides to Return to Ballum*

Barkev is the last living Ghazarian in his family line with direct knowledge of the specific sites in Ballum where he, his family and his ancestors had made pilgrimage for generations, indeed for centuries. Barkev Decl. ¶ 38. He is the last

---

[1] For the Armenians of Kaladouran, it was not safe to travel to the Turkish side after the 1939 division. Barkev Decl. ¶¶ 32-36; Tcholakian Decl. ¶¶ 20-23. In fact, as recently as 2014, Turkish military personnel stationed at the same border abandoned their posts, allowing armed groups, including Islamic State militants, to cross the border from Turkey and enter Kessab and its surrounding villages, including Kaladouran, to drive Armenians from their homes and destroy Christian Armenian heritage. Barkev Decl. ¶ 35; Declaration of Garo B. Ghazarian, attached hereto as Exhibit B ("Garo Decl.") ¶ 8; Tcholakian Decl. ¶ 22. These events of 2014 were at least the third time, in just over a century, that Kaladouran Armenians were expelled from their homes by the Turks and their heritage destroyed and devastated. Barkev Decl. ¶ 24, 25; Garo Decl. ¶ 6; Tcholakian Decl. ¶ 23.

living Ghazarian in his family line who can identify his family's specific prayer sites, specific altars and chapels, at Ballum from his own personal experiences. *Id.* Given his increasing age, Barkev decided in the fall of 2017 to return to Ballum.  *Id.* ¶ 38.

He wanted to identify his family's places of worship in Ballum for his sons and grandchildren. Barkev Decl. ¶¶ 38, 40, 41; Watenpaugh Decl. ¶¶ 25-26. He wanted to take photographs and video of his family's prayer sites in Ballum so that his direct knowledge of his family's religious and cultural heritage in Ballum would not die with him. *Id.* ¶ 42; Watenpaugh Decl. ¶¶ 25-26. He wanted to recite *Hayr Mer,* the Lord's Prayer, at Ballum one more time. Barkev Decl. ¶ 40; Watenpaugh Decl. ¶ 7. Barkev wanted to burn *khoong,* a special incense used by Armenian Christians during religious ceremonies, at his family's prayer sites at Ballum and to pray to the memory of his father, grandfather and forefathers. Barkev Decl. ¶ 40; Watenpaugh Decl. ¶ 9.

### Barkev is Degraded and Ridiculed by Turkey

With the assistance of his son Garo, Barkev visited Turkey's website, in early October 2017, to find an application for entry to Turkey. Barkev Decl. ¶ 44; Declaration of Garo B. Ghazarian, attached hereto as Exhibit B ("Garo Decl."), ¶ 10. The website instructed those seeking entry to apply for a visa at least one month prior to the expected date of departure. Barkev Decl. ¶ 45, Ex. 18. Barkev planned to arrive in Istanbul on December 23, 2017, then travel to Ballum. Barkev Decl. ¶ 43. With the assistance of his son Garo, he completed the visa application pursuant to its terms and submitted the same to the Turkish Embassy in Washington D.C. on October 11, 2017—*73 days prior* to his disclosed date of arrival in Turkey. Barkev Decl. ¶ 43; Garo Decl. ¶ 10; Ex. A10 ("Application"). The Embassy received the Application on October 13, 2017. Barkev Decl. ¶ 43, Ex. A11.

The visa application form—which contained a myriad of different options (other than by a traditional state passport) by which an applicant could identify himself—had an option marked "Other". Barkev Decl. ¶ 43, Ex. A10. Barkev checked this box and identified himself as a Christian Armenian born in Kaladouran, Turkey, intending to make a religious pilgrimage. *Id*. Barkev could not apply as a U.S. citizen.[2] Barkev awaited a response to his Application, but neither the Embassy nor its consular staff responded to him. *Id*. ¶ 45. A month passed, and Barkev grew increasingly nervous and agitated. *Id*. ¶¶ 45-46. Barkev sent a letter to the Embassy by overnight courier on December 6, 2017, inquiring as to the status of the Application. *Id*. ¶ 46; Ex. A12; Ex. A13. The Embassy did not respond to Barkev, even though it had received his letter. *Id*. ¶¶ 46-47. Barkev felt ignored and nullified, like he did not matter. *Id*. ¶¶ 46-47, 49. The Embassy would not even confirm receipt of the Application or respond to the letter, even though only three weeks remained prior to the trip. *Id.* ¶ 46. Barkev felt insulted and ridiculed. Barkev Decl. ¶¶ 49, 53.

Then, on December 11, 2017, Barkev learned from his son that an individual from the Turkish Embassy had telephoned *Garo* inquiring about *Barkev's* Application. *Id.* ¶ 47; Garo Decl. ¶ 15; Declaration of Roman Keshishyan, attached hereto as Exhibit C ("Roman Decl."), ¶¶ 3, 4. This infuriated Barkev, who for months

---

[2] On October 8, 2017—and in retaliation against the United States—Turkey had suspended ***all*** visa services to persons applying as U.S. citizens. Garo Decl. ¶ 26, Ex. B2. A suspension regime remained in effect until December 28, 2017. Garo Decl. ¶ 28, Ex. B4. Accordingly, from the date Barkev made his Application through the date of his intended travel more than two months later, no new visas were being issued to U.S. citizens who planned to visit Turkey who did not have residency abroad. Garo Decl. ¶ 8, Ex. B4. Plaintiff Barkev did not have any residency abroad.

had tried unsuccessfully to make someone at the Embassy acknowledge him. Barkev Decl. ¶ 47. Barkev was furious that the Embassy would not respond to his inquiries and instead contacted his son—not Barkev, the actual applicant. *Id.* ¶ 47. Moreover, not only did the Embassy *not* contact Barkev directly, but now it also claimed to not know the type of visa being requested. Barkev Decl. ¶ 47; Garo Decl. ¶ 16. Barkev felt ridiculed and derided. Barkev Decl. ¶ 47; Garo Decl. ¶ 17. The type of visa he requested was clearly stated on his Application. *Id.* ¶ 49, Ex. A10. Barkev was insulted and confused: the Embassy knew his contact information and knew what type of visa he was requesting but decided to ignore him instead. *Id.* ¶ 47. Barkev felt disrespected, disregarded and demeaned. *Id.*

Plaintiff Barkev sent an email to the Embassy, emphasizing that it had been over two months since he had submitted his Application and that he was seeking entry to Turkey in order to exercise his religious rights and, of course, that time was of the essence. *Id.* ¶ 48-49, Ex. A14. Five days remained until the date that Barkev had stated he would arrive in Turkey. *Id.* ¶ 48, Ex. A10. Barkev was extremely agitated. *Id.* ¶ 49.

Three additional days passed—and there was no return phone call, no email and no communication from the Embassy. *Id.* With only days remaining until his intended travel, Barkev grew increasingly anxious and was not eating or sleeping properly, with family growing concerned. Barkev Decl. ¶ 49; Garo Decl. ¶ 18. So, on December 21, 2017, Barkev sent yet *another* letter by overnight delivery to the Embassy, attaching copies of his December 18, 2017 email, as well as *another* copy of the Application. Barkev Decl. ¶ 50, Exs. A15, A16. In that letter, Barkev also advised that he had even engaged an attorney to assist him. *Id.* ¶ 51, Ex. A15. Still,

there was no response from the Embassy. *Id*. Barkev's lawyer called "Güner" at the Embassy on December 21, 2017, only to reach a voicemail; he left a message with specific details and stressed the matter was of great urgency. Declaration of Karnig Kerkonian, attached hereto as Exhibit D, ¶¶ 4, 5. The Embassy never returned his phone call. *Id.* ¶ 6.

Then, on Friday, December 22, 2017, at 1:20 pm PST—on the day Barkev would have to leave to arrive in Turkey by December 23, 2017—the Embassy sent an email to Barkev. Barkev Decl. ¶ 52, Ex. A17. The email completely disregarded Barkev's submitted Application. Barkev Decl. ¶ 52. Instead, the Embassy *directed Barkev to re-apply, furnishing him instructions on doing so as a U.S. citizen. Id*. The Embassy knew that Barkev's date of arrival in Turkey was December 23, 2017. *Id*. ¶ 43, Ex. A10. Barkev's subsequent communications with the Embassy only underscored this fact and stressed urgency. *Id*. ¶¶ 46, 48, 50-51, Exs. A12, A14, A15. Barkev was left humiliated, hopeless, disheveled and shattered for being lied to by Turkey and for being disregarded, disrespected, and demeaned. *Id.* ¶¶ 53, 55-56.

Crucially, on December 22, 2017, the date of the Embassy's email, *Turkey was not even considering or granting visas to U.S. citizens* without residency in another country. Garo Decl. ¶¶ 20-21, Exs. B2, B3; Barkev Decl. ¶ 44; *see also supra* n.3. Moreover, at no time—from the date of submission of his Application on October 11, 2017 to the date of the email from the Embassy on December 22, 2017—did *any* representative from the Embassy inform Barkev that there was any error or omission in his Application. Barkev Decl. ¶ 53. Turkey neither granted nor denied his visa Application. *Id.* Instead, it ignored Barkev's Application for 73 days; claimed not to know what type of visa was being sought (though it was marked clearly on the

Application); disregarded the Application and communications it had received from Barkev; and then, on the day Barkev would have to leave to arrive in Turley on December 23, 2017, directed Barkev to go to the L.A. Consulate with directions on how to reapply as a U.S Citizen—even though Turkey knew that it was not granting visas to those applying as U.S. citizens. *Id.* ¶ 45-47, 49, 52-53 Ex. A17; Garo Decl. ¶¶ 20-21, Exs. B2, B3.

Barkev is no longer physically able to travel, and he has not been able to travel since late January 2018. Barkev Decl. ¶ 54; Garo Decl. ¶ 23. As the *last* living Ghazarian in his family line with direct knowledge and first-hand experience of his family's pilgrimage sites in Ballum, only Barkev is able to physically identify the same for his children, grandchildren and their progeny. Barkev Decl. ¶¶ 38, 57; Garo Decl. ¶ 25. Turkey's conduct has devastated and destroyed Barkev, as he is unable to pass on to his progeny his direct knowledge of his own family's and forefather's pilgrimage sites in Ballum. Barkev Decl. ¶¶ 56-58; Watenpaugh Decl. ¶¶ 22, 25. It has denied Garo direct knowledge of, and access to, their specific ancestral pilgrimage sites which had been known to generations of their family before them. Garo Decl. ¶¶ 23, 24-25; Watenpaugh Decl. ¶¶ 21-22.

### *Turkey's Targeted Policy Against Native Armenian Christians*

Turkey's actions with respect to Barkev were ***not*** governed by its visa regime—and Turkey neither granted nor denied a visa, within the 30 days or otherwise. Barkev Decl. ¶¶ 47-54. Rather, Turkey ignored and disregarded the Application, and it did so for a specific reason: Barkev identified himself as a native

Armenian Christian. Declaration of Confidential Declarant[3], attached hereto as Exhibit H ("Confidential Decl.") ¶ 6; Barkev Decl. Ex. A10. In fact, Turkey effectively directed Barkev to reapply with an identity ***other than as a native Armenian Christian***. Barkev Decl. ¶¶ 46, 53, Ex. A17; Garo Decl. ¶¶ 20-21, Exs. B2-B4. Turkey's conduct here is wholly consistent with a specific policy of Turkey targeting native Armenian Christians ("Targeted Policy" or "Policy"). Confidential Decl. ¶¶ 6-9. Turkey seeks to strip native Armenian Christians of their identities as such. *Id.* ¶ 7-8.

This Targeted Policy has been, and continues to be, manifested in numerous official and quasi-official actions engineered to dehumanize, degrade, expropriate, alienate, disenfranchise, liquidate and otherwise sever Armenian Christians from their native lands, their native customs and their native religious practices on such lands. Confidential Decl. ¶ 11; Watenpaugh Decl. ¶¶ 22-25; Declaration of Aris Nalci, attached hereto as Exhibit G ("Nalci Decl."), ¶¶ 3-5. Since the Ottoman period through creation of the Turkish Republic and until today, Turkey implements legislative, executive, administrative and other official and/or quasi-official acts to further this Targeted Policy. Confidential Decl. ¶¶ 6-8, 12. The Targeted Policy is

---

[3] Plaintiffs have filed an application seeking to submit this particular declaration under seal and have provided an unredacted version of the declaration to the Court for *in camera* review. *See* ECF 46. Publicly disclosing this declarant's identity will pose a serious risk to his physical safety and to the physical safety of their family in Turkey. *Id.* The application to file under seal is unopposed, as Turkey has not appeared in this matter. *Id.* Should Turkey appear and oppose the filing of this declaration under seal, Plaintiffs' counsel will meet and confer with opposing counsel, in good faith, to remedy the objection in a manner protecting the physical safety of the confidential declarant and the confidential declarant's family. *Id.*

deeply entrenched within the Turkish state, government and, indeed, is manifested in civil society as a whole. *Id.* ¶ 12.

Under the Targeted Policy, government agents are directed by Turkey, whether directly or indirectly, to thwart, harass, confuse, degrade, and humiliate native Armenian Christians seeking to assert their identity as native Armenian Christians. Confidential Decl. ¶ 8. Thwarting the passage of native Armenian Christian heritage, and erasing knowledge of native Armenian religious and cultural traditions, is a core tenet of this Targeted Policy. Confidential Decl. ¶ 5; Nalci ¶¶ 3-5; Tcholakian Decl. ¶ 25. The actions of Turkey's agents towards Barkev and his son Garo are consistent with this Targeted Policy, intended to eradicate native Armenian Christian identity, shatter the dignity of persons identifying themselves as native Armenian Christians, and sever Armenian Christians from the soil itself. Confidential Decl. ¶¶ 6-7, 11; Nalci ¶ 5. This Policy, while byzantine, is specifically intended to erase Armenian cultural and religious heritage in Turkey and to eliminate the memory, history and identity of indigenous Armenian Christians. Confidential Decl. ¶¶ 6-7, 11. Turkey's Targeted Policy is engineered to complete the work left unfinished by the Armenian Genocide. Confidential Decl. ¶ 6; Nalci Decl. ¶¶ 3-5; Tcholakian Decl. ¶ 25.

## JURISDICTION AND VENUE

The Court previously invited Plaintiffs to show cause as to why the Court should not dismiss the case for lack of subject matter jurisdiction. ECF 15. Plaintiffs did so in a detailed Response. ECF 16. Upon review, the Court did not dismiss for lack of subject matter jurisdiction: "Having reviewed the response, [the] Court will defer a determination about its jurisdiction until after Turkey has been served and

[has] had an opportunity to provide its views on the issue." ECF 18. Turkey chose not to provide this Court its views on the issue. ECF 44.

Plaintiffs hereby incorporate their detailed memorandum on subject matter jurisdiction in this case. ECF 16. In addition, Plaintiffs submit the Confidential Declaration in support of the existence of the Targeted Policy against Christian Armenians, as well as the Watenpaugh Declaration, the Nalci Declaration, and the Tcholakian Declaration in support thereof. This Court has jurisdiction over Defendant Turkey in this matter, and venue is proper under 28 U.S.C. § 1391(f)(1).

## ARGUMENT

Defendant Turkey engaged in malicious conduct against Plaintiffs in the United States. Turkey ridiculed, confused, agitated, and disrespected the elderly Barkev, nullifying his identity as a native Armenian Christian and maligning his human dignity in the twilight of his life.[4] Turkey thwarted Plaintiff Barkev's attempt to make pilgrimage as a native Armenian Christian to his baptismal fount and schemed, consistent with its Targeted Policy against native Armenian Christians, to

---

[4] The acts of Turkey's agents are attributable to Turkey under the theory of *respondeat superior*. Under the FSIA, "the 'scope of employment' provision of the tortious activity exception essentially requires a finding that the doctrine of respondeat superior applies to the tortious acts of individuals. This determination is governed by state law." *Doe v. Holy See*, 557 F.3d 1066, 1082 (9th Cir. 2009) citing *Joseph v. Off. of Consulate Gen. of Nigeria*, 830 F.2d 1018, 1025 (9th Cir. 1987); *see* 28 U.S.C. § 1605(a)(5)(A). Under California's *respondeat superior* doctrine, "the determination of whether an employee has committed a tort during the course of employment turns on whether: (1) the act performed was either required or incident to his or her duties, or (2) the employee's misconduct could be reasonably foreseen by the employer." *Shamoun v. Republic of Iraq*, 441 F. Supp. 3d 976, 992 (S.D. Cal. 2020) citing *Joseph*, 830 F.2d at 1025. Turkey's Embassy employees acted as required by their superior, Turkey, in their dealings with Barkev, pursuant to a specific Targeted Policy. Confidential Decl. ¶¶ 6-8, 10-11.

prevent Plaintiff Barkev from passing knowledge of a sacred heritage to his son, Plaintiff Garo, and his progeny. Turkey has acted with intent to forever sever the Ghazarian family's generational knowledge of their unique Armenian Christian religious and cultural heritage at the sacred site in Ballum where they had practiced such heritage for centuries. In doing so, Defendant Turkey violated California's Elder Abuse Act. It has intentionally inflicted emotional distress onto Barkev, and it has intentionally interfered with Plaintiff Garo's expectation of inheritance.[5]

## I.        TURKEY HAS VIOLATED THE ELDER ABUSE ACT.

The California "Elder Abuse Act defines 'abuse' broadly." *Darrin v. Miller*, 32 Cal. App. 5th 450, 454 (2019), *as modified* (Feb. 21, 2019). Causing the mental suffering of an elder constitutes abuse in violation of the Act. California Welfare & Institutions Code, Sections 15600 *et seq* ("Elder Abuse Act"); *Bonfigli v. Strachan*, 192 Cal. App. 4th 1302, 1316 (2011), *as modified on denial of reh'g* (Mar. 24, 2011) ("cases may be brought under the elder abuse statute alleging mental suffering").

In fact, "under section 15610.07, subdivision (a)(1), 'treatment' that is neither physical abuse, neglect, abandonment, isolation nor abduction, can constitute elder abuse if the treatment results in 'physical harm or pain or mental suffering' even if the alleged abuser has no responsibility to care for the elder and no control of the elder's property." *Darrin v. Miller*, 32 Cal. App. 5th at 456; *see also Tanguilig v. Valdez*, 36 Cal. App. 5th 514, 526–27 (2019), *reh'g denied* (June 18, 2019), *review denied* (Aug. 21, 2019). A special relationship between the abuser and the abused is

---

[5] Plaintiffs move for judgment on counts 1, 2, and 5 at this time and reserve their right to proceed on the remaining counts 3 and 4, for which they are not seeking judgment at this time, should Defendant appear and manage to set aside default or vacate default judgment.

not necessary for the conduct to be actionable under the Act: "[n]othing in the text of section 15610.07, subdivision (a)(1), or elsewhere in the Elder Abuse Act requires a special relationship between abuser and victim where the alleged abuse is 'other treatment.'" *Darrin,* 32 Cal. App. 5th at 454.[6]

Here, Defendant was keenly aware that Plaintiff Barkev is a California elder under the statute. Cal. Welf. & Inst. Code § 15610.27; Barkev Decl. ¶ 45, Ex. A10. In its handling of Plaintiff Barkev's Application, Defendant's agents intentionally ignored his request as a native Armenian Christian, thwarting Turkey's own 30-day protocol; neither granted nor denied his Application; and left Barkev in utter confusion, nervousness and agitation. Barkev Decl. ¶¶ 47-54. Defendant acted deceptively, and with malicious intent, when it directed the 86-year-old, on the day of his intended travel, to go to the Los Angeles consulate and apply, providing him directions on how to do so a U.S. citizen—***when Turkey knew it would never grant one to him, as it was not then even granting visas to U.S. citizens***. Barkev Decl., ¶¶ 52, 55; Garo Decl. ¶¶ 20-21, Exs. B2-B4. Turkey toyed with Barkev.

Turkey ridiculed Barkev also by not acknowledging his identity as an Armenian Christian from Turkey; by ignoring and rendering it meaningless and of no consequence; by pretending it did not understand what type of visa he was seeking (when it was clear on the Application); by contacting his son as opposed to him; and by doing these acts at a time when Plaintiff Barkev sought religious meaning at his

---

[6] The *Darrin* court further explains: "In this respect, 'other treatment' is similar to '[p]hysical abuse,' which is defined in section 15610.63 ***without reference to relationships between the elder and alleged abuser***." *Darrin,* 32 Cal. App. 5th at 454 (emphasis added).

place of baptism in Turkey. Barkev Decl. ¶¶ 39, 49. In fact, by directing Plaintiff to apply with ***another*** identity, not the actual identity which tied him to his native land, Turkey rendered Barkev's sense of self meaningless, causing him great indignity, confusion, and emotional distress. Barkev Decl. ¶¶ 56, 58; *see also* Watenpaugh Decl. ¶ 21-25; Cal. Welf. & Inst. Code §§ 15610.07, 15610.53 ("'Mental suffering' means fear, agitation, confusion, severe depression, or other forms of serious emotional distress that is brought about by . . . harassment, or by deceptive acts performed or false or misleading statements made with malicious intent to agitate, confuse, frighten, or cause . . . serious emotional distress of the elder.").

Turkey's deceptive acts and misleading statements, pursuant to a Targeted Policy mandating the denigration and degradation of those asserting rights as native Armenian Christians, disregarded the mental suffering its actions would cause on Plaintiff Barkev. Confidential Decl. ¶ 11. In fact, Turkey acted to *cause* precisely this type of mental suffering—and did. *Id*. ¶ 8; Barkev Decl. ¶ 58. Barkev's very dignity, his sense of self, his value and indeed his identity was rendered meaningless, indeed nullified, by Turkey—just as Turkey intended. Barkev Decl. ¶ 58; Watenpaugh Decl. ¶ 22-25; Confidential Decl. ¶ 10, 13. Barkev is "haunted by the knowledge that he is unable to carry out his duty to pass on the knowledge of the sacred site of his ancestors to his progeny" as his ancestors had done for generations. Watenpaugh Decl. ¶ 22; Barkev Decl. ¶¶ 56, 58. He is dejected, devastated and degraded. Watenpaugh Decl. ¶ 22; Barkev Decl. ¶¶ 56, 58. His health has worsened; he can no longer travel and, due to Turkey's actions, he is forever unable to make pilgrimage to his baptismal site, pray again at his family's prayer sites and pass along his native knowledge of the specific prayer sites in Ballum to his son and family. *Id.* ¶ 54-57.

His inability to do for his progeny what his ancestors has done for centuries has caused Barkev to be "emotionally and mentally paralyzed" and ashamed at the end of his life. *Id.* ¶ 58.

Plaintiff Barkev is entitled to damages from Turkey under the Act for his mental suffering. "[D]amages may be given for mental suffering[.]" *Long v. PKS, Inc.*, 12 Cal. App. 4th 1293, 1298 (1993); *see also* Cal. Welf. & Inst. Code § 15610.53. The Ninth Circuit has held that there is also no heightened standard required for mental suffering. *Pershing Park Villas Homeowners Ass'n v. United Pac. Ins. Co.*, 219 F.3d 895, 903 (9th Cir. 2000). In *Pershing,* it upheld damages for mental suffering in the amount of $200,000 each for each of three property developers for their mental suffering due to an insurer's bad faith and the resulting financial loss related to a property development project. *Pershing,* 219 F.3d at 899. A similar award, for the mental suffering experienced by Barkev, is warranted here.

Plaintiff Barkev has also been damaged in the amount of $160.62 in costs related to his planned religious pilgrimage. Barkev Decl. ¶ 45, 47, 51 and Exs. A11, A13 and A16; Garo Decl. ¶ 31. The Act allows Plaintiff Barkev the right to recover these damages as well. Cal. Welf. & Inst. Code § 15610.27, 15610.53; *Negrete v. Allianz Life Ins. Co. of N. Am.*, 927 F. Supp. 2d 870, 890–91 (C.D. Cal. 2013) ("The [] Elder Abuse Act makes additional damages available to a prevailing plaintiff[.]").

Wherefore, Plaintiff Barkev respectfully requests that this Court award him damages pursuant to the Act in the amount of $200,160.62, and also respectfully requests that this Court award him the costs of suit pursuant to Fed. R. Civ. P. 54(d).

## II.   TURKEY INTENTIONALLY INFLICTED EMOTIONAL DISTRESS ON PLAINTIFF BARKEV GHAZARIAN.

To prevail on an intentional infliction of emotional distress claim, a plaintiff must prove (1) extreme and outrageous conduct by the defendant with the intention of causing, or reckless disregard of the probability of causing, emotional distress; (2) the plaintiff's suffering severe or extreme emotional distress; and (3) actual and proximate causation of the emotional distress by defendant's outrageous conduct. *Sabow v. United States*, 93 F.3d 1445, 1454 (9th Cir. 1996), *as amended* (Sept. 26, 1996); *Christensen v. Superior Ct.*, 54 Cal. 3d 868, 903 (1991).[7] It is not essential that a trier of fact finds a malicious or evil purpose; it is enough that the defendant devotes little or no thought to the probable consequences of his conduct. *KOVR-TV, Inc. v. Superior Ct.*, 31 Cal. App. 4th 1023, 1031–32 (1995). "Little or no thought" constitutes, in this context, "reckless disregard" of the rights and sensitivities of others. *Miller v. Nat'l Broad. Co.*, 187 Cal. App. 3d 1463, 1488 (Ct. App. 1986). Moreover, emotional distress "may consist of any highly unpleasant mental reaction such as fright, grief, shame, humiliation, embarrassment, anger, chagrin, disappointment or worry." *Hailey v. California Physicians' Serv.*, 158 Cal. App. 4th 452, 476 (2007), *as modified on denial of reh'g* (Jan. 22, 2008); *Bikkina v. Mahadevan*, 241 Cal. App. 4th 70, 88 (2015) ("Shame, humiliation, embarrassment, or anger can constitute emotional distress.").

---

[7] Courts have determined that a mental examination is not necessary. *Turner v. Imperial Stores*, 161 F.R.D. 89, 97 (S.D. Cal. 1995) ("'emotional distress' is not synonymous with the term 'mental injury' as used by the Supreme Court in *Schlagenhauf v. Holder* . . . a claim for damages for emotional distress, without more, is [not] sufficient to put mental condition "in controversy" within the meaning of the Rule."). Barkev is not claiming mental *injury*.

Notably, degrading a person by rendering them powerless also amounts to emotional distress. *Rulon-Miller v. Int'l Bus. Machines Corp.*, 162 Cal. App. 3d 241, 255 (Ct. App. 1984), disapproved of on other grounds by *Foley v. Interactive Data Corp.*, 47 Cal. 3d 654, 765 P.2d 373 (1988), and by *Guz v. Bechtel Nat. Inc.*, 24 Cal. 4th 317, 8 P.3d 1089 (2000) (where denying a right granted to all other employees "degrade[d] her as a person."). The California court found further that defendant's conduct "was intended to emphasize that she was powerless to do anything to assert her rights as an IBM employee. *Rulon-Miller*, 162 Cal. App. 3d at 255. "And such powerlessness is one of the most debilitating kinds of human oppression." *Id.*; *see also Huber v. Standard Ins. Co.*, 841 F.2d 980, 986–87 (9th Cir. 1988) (conduct to "humiliate and degrade" is actionable). Even "jokes and insults can, in a proper situation, be sufficiently egregious providing plaintiff is particularly sensitive, and defendant is aware of those sensitivities and seeks to exploit them." *Meagher v. Lamb-Weston, Inc.*, 839 F. Supp. 1403, 1410 (D. Or. 1993). Finally, severe emotional distress and devastation can even be caused by the loss of "treasured personal belongings" from a self-storage locker. *See Gonzales v. Pers. Storage, Inc.*, 56 Cal. App. 4th 464, 468 (1997), *as modified on denial of reh'g* (Aug. 7, 1997).

Plaintiff Barkev's showing of emotional distress is compelling here. Defendant was aware of Barkev's particular sensitivities—his age and his desire for a religious pilgrimage—but intended to degrade, degrade and ridicule him pursuant to the Policy. It gave "little or no thought" to Barkev's sensitivities as evidenced by its disregard of his Application and Barkev. Barkev Decl. ¶¶ 45, 47-54, Ex. A10; Confidential Decl. ¶¶ 8, 10. Turkey knew Barkev is a native Armenian Christian who sought to exercise his religious rights and native customs in Turkey and that he had

progeny. *Id.* ¶ 54; Exhibit A10; Confidential Decl. ¶ 13. It ignored Barkev's Application in the first place, not informing him of any error, not granting it, not denying it, not communicating with him (calling his son instead), and then waiting until the day before his intended arrival in Turkey to tell him to re-apply for Turkish visa as a U.S. citizen—knowing that such a visa was suspended at the time and would not be granted to him. *See* Garo Decl. ¶¶ 20-21, Exs. B2-B4; Barkev Decl. ¶ 53. Turkey ridiculed him and made him feel powerless. Barkev Decl. ¶ 46, 51, 58; *see Rulon-Miller*, 162 Cal. App. 3d at 255.

Plaintiff Barkev's identity as an Armenian Christian, and his association with the sacred site in Ballum figures prominently in Barkev's identity. Watenpaugh Decl. ¶¶ 9, 11-12. Turkey's conduct attacked and humiliated that very dignity. Barkev Decl. ¶¶ 56, 58; Watenpaugh Decl. ¶¶ 7, 25, 26. Turkey did so intentionally and maliciously for the purpose of causing Barkev to suffer mental anguish, emotional harm, and physical distress. Barkev Decl. ¶¶ 56, 58; Confidential Decl. ¶¶ 11. Turkey rendered Barkev's identity meaningless and made him feel powerless—and "powerlessness is one of the most debilitating kinds of human oppression." *Rulon-Miller*, 162 Cal. App. 3d at 255. Barkev was left feeling "cursed and ashamed for dying with these memories in [his] head, circling every day and every night, without being able to show them the places in Ballum." Barkev Decl. ¶ 58. He was left coping with the reality of going to his "grave devastated, confused, and ashamed." *Id.*

Barkev is entitled to damages for the extreme emotional distress caused upon him. In *Rulon-Miller,* the California Court of Appeals upheld an award of $100,000 for the emotional distress caused by a wrongful discharge. 162 Cal. App. 3d at 243. In *Little v. Stuyvesant Life Ins. Co.*, 67 Cal. App. 3d 451, 465 (Ct. App. 1977), the

appellate court upheld an award of $172,325 as compensation for an insured's emotional distress caused by defendant's termination of insurance benefits. In *Plotnik v. Meihaus*, 208 Cal. App. 4th 1590, 1615 (2012), the court awarded emotional distress damages resulting from a dog's injury against two of four defendants in the amounts of $57,950 and $100,209.53. *Id.* at 1625. Finally, the California appellate court upheld an award of $232,582 in emotional distress damages when a self-storage facility tenant learned of the conversion of property in storage that had sentimental value to her. *Gonzales*, 56 Cal. App. 4th at 468.

Wherefore, Plaintiff Barkev respectfully requests that this Court award him damages in the amount of $200,000 as to Count 2, a figure well within the range of emotional distress damages awarded in California cases, as well as the costs of suit pursuant to Fed. R. Civ. P. 54(d).

## III.   TURKEY INTENTIONALLY INTERFERED WITH PLAINTIFF GARO GHAZARIAN'S EXPECTATION OF INHERITANCE.

Intentional interference with expectation of inheritance is a recognized cause of action in California. *See Beckwith v. Dahl*, 205 Cal. App. 4th 1039, 1050 (2012). To prevail, a plaintiff must prove that (1) there was an expectancy of an inheritance, (2) that the bequest or devise would have been in effect at the time of death of testator by reasonable degree of certainty, (3) that defendant had knowledge of plaintiff's expectancy of inheritance and took deliberate action to interfere with it, (4) that the interference was conducted by independently tortious means, and (5) that Plaintiff was damaged by defendant's interference. *Id.* at 1057-58.

The Ninth Circuit has held that the object of inheritance need ***not*** be something tangible. *See In re Bellingham Ins. Agency, Inc.*, 702 F.3d 553, 571 (9th Cir. 2012),

*aff'd sub nom. Exec. Benefits Ins. Agency v. Arkison*, 573 U.S. 25 (2014) ("Property of the estate includes intangible assets[.]'"); *see also In re Watman,* 301 F.3d 3, 12 (1st Cir. 2002) ("intangible assets as goodwill and overall going concern are valuable"); *Hunt v. Phinney,* 177 Cal.App.2d 212, 216 (1960) ("goodwill . . . is property and as such will be protected by the courts."). The intangible inheritance here—specific knowledge of the native traditions of the Ghazarian family at Ballum—is not only a valuable intangible item, but it is also transferable and, in fact, has been transferred for generations. Barkev Decl. ¶¶ 7, 42-43, 58; Garo Decl. ¶¶ 22, 24-25; Watenpaugh Decl. ¶¶ 22-34.

Plaintiff Garo had an expectancy to receive the knowledge of these certain native traditions of the Ghazarian family at Ballum, and there is reasonable certainty of the bequest being in effect at the time of Barkev's death. Barkev Decl. ¶¶ 7, 42-43, 57; Garo Decl. ¶¶ 25-26. Turkey had knowledge of such inheritance; in fact, Turkey has engineered an entire Policy precisely to prevent the transfer of such native traditions and knowledge by Christian Armenians. Confidential Decl. ¶ 8. Turkey's Targeted Policy is "specifically intended to erase Armenian cultural and religious heritage in Turkey and to eliminate the memory, history and identity of indigenous Armenian Christians." *Id.* But for Defendant's agents actions, independent torts as explained *supra,* Barkev would have passed this intangible inheritance to his son Garo. Barkev Decl. ¶¶ 7, 42-43, 57; Garo Decl. ¶¶ 11, 25-26; Watenpaugh Decl. ¶ 25; *supra* Sections I and II. Plaintiff Garo was damaged by being deprived of a key inheritance—and thereby severed from, unable to know, to use and to himself transfer his family's generational knowledge of particular rites and sacraments practiced by the Ghazarians at their altars and specific places in Ballum for centuries. Garo Decl.

¶¶ 11, 25-26; Nalci Decl. ¶ 6. Indeed, as the Eleventh Circuit explained: "[t]he value of genetic heritage is, quite literally, incalculable." *Alabama-Tombigbee Rivers Coalition v. Kempthorne,* 477 F.3d 1250, 1273 (11th Cir. 2007), *cited in In re Delta Smelt Consolidated Cases,* 663 E.D. Supp.2d 922, 941 (E.D. Cal. 2009).[8]

In establishing the tort of intentional interference with expected inheritance in California, the *Beckwith* court explained that "[t]he tort of IIEI developed under the general principle of law that whenever the law prohibits an injury it will also afford a remedy." 205 Cal.App.4th at 1051 (cleaned up). California jurisprudence posits that "[f]or every wrong there is a remedy." Cal. Civ. Code, § 3523; *see Beckwith*, 205 Cal.App.4th at 1051. Turkey's conduct here, its intentional interference with the transfer of an intangible asset from Barkev to Garo, requires remedy: "[e]very person is bound, without contract, to abstain from injuring the person or property of another, or infringing upon any of his or her rights." Cal. Civ. Code, § 1708; *see also Beckwith,* 205 Cal.App.4th at 1051. As the California Supreme Court has stated, "we cannot let the difficulties of adjudication frustrate the principle that there be a remedy for every substantial wrong." *Dillon v. Legg*, 68 Cal.2d 728, 739 (1968).

On default judgment, Plaintiff Garo seeks a judgment order that Defendant Turkey has intentionally interfered with his expectation of inheritance.[9] The

---

[8] California courts even determined parental rights on the basis of protecting personal cultural heritage. *See In re Desiree F.*, 83 Cal.App.4th 460, 469 (2000) ("it is in the best interests of the child to retain tribal ties and cultural heritage and in the interest of the tribe to preserve its future generations, a most important resource."); *see also Mississippi Band of Choctaw Indians v. Holyfield,* 490 U.S. 30, 32–36, 109 S.Ct. 1597 (1989); *In re W.B.,* 55 Cal.4th 30, 48 (2012).

[9] Plaintiff Garo is not seeking compensatory damages at this stage in the proceedings; however, he does not waive his right to seek alternative relief, including monetary damages, in the event that Turkey chooses to appear in this case and manages to set

California Supreme Court has held that "tort law is primarily designed to vindicate social policy." *Foley v. Interactive Data Corp.,* 47 Cal.3d 654, 683 (1988); *see also California Cap. Ins. Co. v. Maiden Reinsurance N. Am., Inc.*, 472 F. Supp. 3d 754, 758 (C.D. Cal. 2020). A judgment finding that Turkey intentionally interfered with Garo's expectation of inheritance would serve that fundamental objective.

Wherefore, Plaintiff Garo respectfully requests that this Honorable Court enter judgment that Turkey has intentionally interfered with his expected inheritance as well as award Plaintiffs the costs of suit pursuant to Fed. R. Civ. P. 54(d).

### CONCLUSION

For the reasons stated herein, Plaintiffs respectfully request this Honorable Court grant default judgment in their favor and against Defendant Republic of Turkey on Counts 1, 2 and 5 of the Complaint. Plaintiffs further respectfully request that this Honorable Court award compensatory damages in the amount of $200,160.12, or, alternatively, in such different amount that this Honorable Court deems fair and just. Finally, Plaintiffs respectfully request an award of costs in the amount of $9,610 pursuant to Fed. R. Civ. P. 54(d). *See* Declaration of Elizabeth Al-Dajani, attached hereto as Exhibit I ("Al-Dajani Decl.") ¶ 4.

May 21, 2021                                    Respectfully submitted,

                                               /s/ Gayane S. Khechoomian

                                               One of Plaintiffs' Attorneys

---

aside default or vacate default judgment. "There is no fixed rule for the measure of tort damages under California Civil Code section 3333." *Metz v. Soares*, 142 Cal. App. 4th 1250, 1255 (2006) (cleaned up).

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**EXHIBIT LIST**

| Exhibits | Description of Documents |
|----------|--------------------------|
| A | Declaration of Barkev Ghazarian |
| B | Declaration of Garo Ghazarian |
| C | Declaration of Roman Keshishyan |
| D | Declaration of Karnig Kerkonian |
| E | Declaration of Hagop Tcholakian |
| F | Declaration of Heghnar Watenpaugh |
| G | Declaration of Aris Nalci |
| H | Declaration of Confidential Declarant |
| I | Declaration of Elizabeth Al-Dajani |